**C O U R T   O F   A P P E A L S**

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

CHARLES LEROY COPE,

        Defendant-Appellant,

UNPUBLISHED
December 22, 2015

No. 321697
Marquette Circuit Court
LC No. 13-051605-FC

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JASON DAVID SADOWSKI,

        Defendant-Appellant.

No. 322621
Marquette Circuit Court
LC No. 13-051606-FC

Before: MARKEY, P.J., and STEPHENS and RIORDAN, JJ.

PER CURIAM.

In Docket No. 321697, defendant Charles Leroy Cope (Cope) appeals as of right his jury trial convictions of two counts of torture, MCL 750.85, and two counts of unlawful imprisonment, MCL 750.349b. He was sentenced concurrently to 25 to 40 years for each count of torture, and 10 to 15 years for each count of unlawful imprisonment.

In Docket No. 322621, defendant Jason David Sadowski (Sadowski) appeals as of right his jury trial convictions of solicitation to commit murder, MCL 750.157b(2), two counts of torture, MCL 750.85, two counts of unlawful imprisonment, MCL 750.349b, and two counts of assault by strangulation, MCL 750.84. He was sentenced concurrently as a fourth-offense habitual offender, MCL 769.12, to 40 to 80 years for solicitation to commit homicide and for each count of torture, 10 to 15 years for each count of unlawful imprisonment, and 5 to 10 years for each count of assault by strangulation.

Both defendants now appeal. These appeals have been consolidated for appellate review. While we affirm in Docket No. 321697 (Cope), we vacate in Docket No. 322621 (Sadowski).

## I. FACTUAL BACKGROUND

The two victims—Angel Paris (Angel) and Becky Bressette (Becky)[1]—approached Sadowski behind Hickey's Bar in Ishpeming, Michigan, asking for a lighter to smoke cigarettes. Becky eventually communicated that she was interested in obtaining marijuana and Angel was interested in Mixed Martial Arts (MMA) fighting, with which Sadowski was involved. All parties agreed to go to Sadowski's gym.

However, the parties dispute what occurred after arriving at the gym. Both victims admit that they stole money from Sadowski's wallet, although they did not provide a consistent story regarding the amount taken. At trial, Angel testified that she took four dollars, giving two to Becky. However, the first responding police officer testified that Angel informed him that she had stolen three dollars and Becky had taken ten dollars. Becky, on the other hand, testified that Angel took a couple of dollars while Becky grabbed a handful of change.

Angel testified that after the theft, she asked to use the bathroom, which is when she confessed to Sadowski about the theft, and gave him two dollars she had taken from his wallet. Becky, however, testified that only Sadowski went to the bathroom, and that when he returned he accused them of taking money. Both victims testified that as soon as Becky handed Sadowski the money, he hit her.

Becky testified that after being hit, she grabbed onto the curtains and pulled them off, but police pictures purported to show those curtains still intact and installed on the window. Becky also testified that Sadowski made her lie on the bed and forced Angel to insert her hand inside of Becky's vagina at least twice to check if money was hidden there. Angel, however, testified that while Sadowski wanted them to check each other's vaginas, they refused. Angel vehemently denied inserting her fingers inside of Becky's vagina.

Both women testified that Sadowski was holding a sword and forced them to go downstairs to the basement, where Cope was sleeping. Both victims testified that it was a joint effort of defendants in duct taping them to poles in the basement. The women testified that Sadowski smashed their heads into the poles, threatened to kill them, choked them multiple times until they both lost consciousness, and repeatedly beat them. Angel testified that she vomited on herself, and Becky testified that she was burned with a cigarette. Both women testified that Cope offered them Xanax, although only Angel admitted to ingesting it, and that he acted differently when Sadowski was not in the room.

---

[1] Because Becky was deceased at the time of trial, a video recording of her preliminary examination testimony was played for the jury. On the first day of trial, the court struck certain portions of Becky's testimony, which presumably the parties did not play for the jury. Becky's death was unrelated to the crimes at issue in this case.

According to Angel, she eventually was able to gain Sadowski's trust. She claimed that Sadowski untied her and asked her to kill Becky in order to ensure that neither woman would "snitch." Angel testified that she agreed, although her intention was to kill Sadowski instead. Angel testified that while both defendants were out of the room, she located a jean jacket with a cellular phone inside and was able to call 911 for help.

Sadowski, however, testified to a much different chain of events. He claimed that after the theft was revealed, the night devolved into a fight between Becky and Angel, with each woman alternating between denials and shifting the blame. The two women continued to argue until it escalated into a physical altercation, wherein they were punching each other and careening into furniture. He attempted to separate them, although the argument continued throughout the night. Sadowski testified that his role in the ensuing evening was an attempt to deescalate the mounting tension between the two women, and to recover the remainder of his money and missing marijuana. He testified that he continued to ply them with cigarettes and alcohol, while giving them advice about getting off of drugs and making better life choices.

Eventually, he suggested moving the gathering to the basement because Cope had a different type of cigarettes. Sadowski made several trips upstairs, and one time encountered his ex-wife, Sarah Pietro. Pietro testified that she went downstairs and while she did not recognize the women, they were drinking alcohol and appeared unharmed. Pietro eventually left, and Sadowski returned to the basement. He testified that he encountered the shocking sight of Becky and Angel duct taped to the poles. Sadowski testified that Angel was in the midst of winding tape, and Cope was standing next to her. When Sadowski asked what was going on, Angel replied that no one was leaving until Sadowski recovered the remainder of his money. Sadowski testified that he began cutting Angel loose and then Becky, although he cut only the tape around Becky's head because the tape around her hands was loose enough that she could just slip out of it. Sadowski testified that although Becky and Angel continued to argue, he had reached his limit and wanted them to leave. However, they were too intoxicated to drive. He testified that Angel offered to kill Becky for him, and he was astounded. He testified that he was leaving to get them coffee when he encountered the police.

The police arrived and encountered Sadowski leaving the building. Both officers testified that Sadowski at first refused them entrance, and denied having a basement. Eventually, they entered the building and found the women, who were both overwrought and acting hysterical. The officers testified that Cope was standing between Becky and Angel, and that Becky was sitting on the ground with her arms around a pole and duct tape around her arms. One officer testified that while Becky had duct tape on her wrist, she was able to undo it herself.

Several police officers testified about the obvious injuries Becky and Angel had on their bodies, which primarily consisted of significant bruising and duct tape residue. One of the officers testified that no cuts or bruises were found on Sadowski's hands. An officer also testified that he did not recall Angel mentioning a sword when explaining what had occurred. While swords were located in the building, none were taken into evidence. No DNA analysis was performed on the duct tape, and several empty vodka bottles were found in the basement.

Both victims were examined at the hospital, and Dr. Lyle Vanderschaaf detailed their injuries. Ultimately, he testified that the victims' injuries were consistent with the story they

provided, but could have occurred in a different way, namely, a fistfight with another person. He testified that the injuries could be consistent with the victims punching or hitting each other, bumping into furniture, or falling.

The jury found defendant Cope guilty of two counts of torture and two counts of unlawful imprisonment, and defendant Sadowski guilty of solicitation to commit murder, two counts of torture, two counts of unlawful imprisonment, and two counts of assault by strangulation. Both defendants now appeal.

## II. DOCKET NO. 321697 (COPE)

### A. SUFFICIENCY OF THE EVIDENCE

#### 1. STANDARD OF REVIEW

Cope challenges the sufficiency of the evidence underlying his convictions. We review "de novo a challenge on appeal to the sufficiency of the evidence." *People v Ericksen*, 288 Mich App 192, 195; 793 NW2d 120 (2010). "In determining whether the prosecutor has presented sufficient evidence to sustain a conviction, an appellate court is required to take the evidence in the light most favorable to the prosecutor" to ascertain "whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Tennyson*, 487 Mich 730, 735; 790 NW2d 354 (2010) (quotations marks and citations omitted). "All conflicts in the evidence must be resolved in favor of the prosecution and we will not interfere with the jury's determinations regarding the weight of the evidence and the credibility of the witnesses." *People v Unger*, 278 Mich App 210, 222; 749 NW2d 272 (2008). However, "[c]ircumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *People v Allen*, 201 Mich App 98, 100; 505 NW2d 869 (1993).

#### 2. ANALYSIS

Cope asserts that there was insufficient evidence to support his convictions of two counts of torture and two counts of unlawful imprisonment. A person commits torture, MCL 750.85, when "with the intent to cause cruel or extreme physical or mental pain and suffering, [he] inflicts great bodily injury or severe mental pain or suffering upon another person within his or her custody or physical control[.]" The statute also provides several definitions, none of which Cope seems to challenge specifically. " 'Cruel' means brutal, inhuman, sadistic, or that which torments" and " '[c]ustody or physical control' means the forcible restriction of a person's movements or forcible confinement of the person so as to interfere with that person's liberty, without that person's consent or without lawful authority." MCL 750.85(2)(a) and (b).

The statute further states:

(d) "Severe mental pain or suffering" means a mental injury that results in a substantial alteration of mental functioning that is manifested in a visibly demonstrable manner caused by or resulting from any of the following:

(*i*) The intentional infliction or threatened infliction of great bodily injury.

-4-

(*ii*) The administration or application, or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt the senses or the personality.

(*iii*) The threat of imminent death.

(*iv*) The threat that another person will imminently be subjected to death, great bodily injury, or the administration or application of mind-altering substances or other procedures calculated to disrupt the senses or personality. [MCL 750.85(2).]

However, proof that a victim suffered pain is not an element of the crime. MCL 750.85(3).

As for unlawful imprisonment, MCL 750.349b(1), a person is guilty of that crime if he knowingly restrains another person under any of the following circumstances:

(a) The person is restrained by means of a weapon or dangerous instrument.

(b) The restrained person was secretly confined.

(c) The person was restrained to facilitate the commission of another felony or to facilitate flight after commission of another felony. [See also *People v Bosca*, 310 Mich App 1, 6; ___ NW2d ___ (2015).]

Rather than challenge the specific elements of his convictions, Cope primarily focuses on all the action that he did not take. For example, he highlights the events that occurred upstairs, with Sadowski initiating the violence and leading the victims downstairs at sword point. Cope emphasizes the fact that he had nothing to do with what occurred upstairs. He then characterizes his ensuing role as merely following the orders of Sadowski out of fear for his own safety.

However, Cope seems to ignore the fact that the prosecution advanced an aiding and abetting theory at trial. The aiding and abetting statute provides that "[e]very person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense." MCL 767.39. The Michigan Supreme Court described the following three elements necessary for a conviction under an aiding and abetting theory: (1) the defendant or another committed the charged crime; "(2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement." *People v Plunkett*, 485 Mich 50, 61; 780 NW2d 280 (2010) (quotation marks and citation omitted).

"The aiding and abetting statute encompasses all forms of assistance rendered to the perpetrator of a crime and comprehends all words or deeds that might support, encourage, or incite the commission of a crime." *Bosca*, 310 Mich App at 8 (quotation marks and citation omitted). Moreover, "[i]ntent may be inferred from a defendant's words, acts, means, or the manner used to commit the offense." *Id*. (quotation marks and citation omitted).

-5-

Here, Angel and Becky gave detailed testimony regarding the frightful events that occurred in the basement of the gym. According to both victims, the minute they entered the basement, Cope immediately jumped to do Sadowski's bidding. Cope either duct taped them to the poles or assisted Sadowski in doing so. According to the victims, the ensuing events were filled with repeated physical abuse and threats of murder. Both victims testified that Sadowski smashed their heads into the poles, threatened to kill them, choked them multiple times until they lost consciousness, and continually beat them throughout the night. The severe mental anguish continued throughout the night, as not only were both victims convinced they were to be murdered, but Sadowski even told Angel that he was going to kill her fiancé. Angel testified that she vomited on herself, and Becky testified that she was burned with a cigarette.[2]

Cope, however, focuses on evidence that he offered the victims Xanax, gave them food, helped them urinate, and acted in a somewhat kinder manner when Sadowski was not in the room. Simply because Cope was the nicer of the two captors does not negate the jury's finding of guilt. Despite these fleeting overtures of comfort, Cope assisted Sadowski in these crimes in a very tangible way, as both victims testified that he assisted in duct taping them to the poles. Moreover, according to Angel, she begged Cope to call 911, and he refused, stating that Sadowski was his "brother" and that "we're in this together[.]" He also declined to untie them when Sadowski left the room, despite Becky asking him to do so. Because intent may be inferred from Cope's words, acts, means, or the manner used to commit the offense, *Bosca*, 310 Mich App at 8, there was sufficient circumstantial evidence of Cope's intent to commit these crimes.

It is true that the jury was charged with significant credibility determinations, and there were conflicting aspects of the victims' story. However, in the context of the sufficiency of the evidence, "[a]ll conflicts in the evidence must be resolved in favor of the prosecution and we will not interfere with the jury's determinations regarding the weight of the evidence and the credibility of the witnesses." *Unger*, 278 Mich App at 222. Moreover, although Cope emphasizes his duress defense, that theory was presented to the jury, who rejected it. Now on appeal, Cope simply ignores evidence that contradicts his duress theory and fails to identify evidence of an imminent threat. Cope's challenge to the sufficiency of the evidence fails.

## B. DURESS JURY INSTRUCTION

### 1. STANDARD OF REVIEW

Cope next challenges the duress instruction. We review de novo questions of law arising from jury instructions. *People v Guajardo*, 300 Mich App 26, 34; 832 NW2d 409 (2013). We

---

[2] Although Cope does not specifically challenge the elements of torture, we note that both women repeatedly testified that they believed they were going to be murdered that night, and Angel testified that Sadowski asked her to murder Becky. MCL 750.85(2)(d)(*iii*) and (*iv*). Further, the first police officers at the scene testified that both women were hysterical and crying. In fact, Angel had to be subdued with handcuffs because she rushed the police officers in hysteria. MCL 750.85(2)(d).

review for an abuse of discretion the court's decision regarding the applicability of an instruction to the facts of the case. *People v Armstrong*, 305 Mich App 230, 239; 851 NW2d 856 (2014). "The defendant bears the burden of establishing that the asserted instructional error resulted in a miscarriage of justice." *People v Dupree*, 486 Mich 693, 702; 788 NW2 399 (2010).

## 2. ANALYSIS

Cope requested the duress jury instruction, but not the last element.[3] The trial court found there was circumstantial evidence of the elements of the duress defense including the fifth element because there was evidence that Cope did the initial taping of the women.

"Duress is a common-law affirmative defense." *People v Lemons*, 454 Mich 234, 245; 562 NW2d 447 (1997). It applies when the crime the defendant commits is the lesser of two evils. *Id.* at 245-246. The defendant asserting this defense bears the burden of producing some evidence of the essential elements of the defense. *Id.* at 246. As the Court in *Lemons* articulated, the essential elements of the defense are: (1) the threatening conduct was sufficient to create in the mind of a reasonable person a fear of death or serious bodily harm; (2) the conduct caused such fear of death or serious bodily harm in the defendant; (3) the fear or duress was in the mind of the defendant at the time he acted; and (4) the defendant committed the act to avoid the threatened harm. *Id.* at 247.

The *Lemons* Court specified that the threatening conduct or act of compulsion must be present, imminent, and impending, as a threat of future injury is not enough to sustain a duress defense. *Id.* Significantly, the Court also held that "the threat must have arisen without the negligence or fault of the person who insists upon it as a defense." *Id.* (quotation marks and citation omitted); *People v Henderson*, 306 Mich App 1, 5; 854 NW2d 234 (2014); *People v Chapo*, 283 Mich App 360, 371-372; 770 NW2d 68 (2009) ("It must arise without the negligence or fault of the person claiming the defense.").

Consistent with the law, the trial court in this case instructed the jury that in order to find that Cope acted under duress, it had to find the situation did not arise because of Cope's negligence or fault. On appeal, Cope contends that this final element should not have been read because the evidence did not support it. In particular, Cope highlights the note in the standard jury instruction, CJI 7.6, which states that the fault/negligence prong should be used "only where there is some evidence that the defendant found himself in the position of having to commit the crime through his own fault or negligence. Michigan law is unclear on whether a defendant can claim duress only where the defendant is completely free of fault."

---

[3] The trial court read the following duress instruction to the jury: "Under the law there was duress if five things were true: **one**, the threatening behavior would have made a reasonable person fear death or serious bodily harm; **two**, the defendant actually was afraid of death or serious bodily harm; **three**, the defendant had this fear at the time he acted; **four**, the defendant committed the act to avoid the threatened harm; **five**, the situation did not arise because of the defendant's fault or negligence."

However, in this case, there was evidence that Cope found himself in the position of having to commit the crime through his own fault or negligence. Both victims testified that Cope either taped them to the pole or at least aided Sadowski in taping them to the pole. There were frequent instances where Cope was left alone with the victims. Instead of calling for help, as there was a cellular phone in the basement, or untying the victims, Cope did nothing. In fact, Angel testified that when she asked him to call 911, he refused and said, "[T]hat's my brother" and "I'm in this – we're in this together[.]" Both victims testified that Cope acted differently toward them when Sadowski was in the room, actively contributing to the abuse they suffered by yelling at them and acting meanly toward them. Angel testified Cope told her that if she kept trying to chew off the duct tape, he was going to retape her, and she was not going to like it. Angel also testified that when she tried to hang herself from the duct tape, Cope told her that she "was not getting out of it that easily."

Further, while Cope focuses heavily on the standard jury instructions, he appears to overlook the fact that "use of the standard criminal jury instructions is not mandatory and they are not binding authority." *People v Williams*, 288 Mich App 67, 76 n 6; 792 NW2d 384 (2010). We are bound by our Supreme Court's determination that a defendant claiming duress must establish his lack of fault or negligence in creating the coercive situation. *Lemons*, 454 Mich at 247. We fail to see any error in the jury being instructed according to the law as dictated by our Supreme Court. See *id.* Thus, "[t]he trial court's instructions, when viewed as a whole, adequately protected defendant's rights." *People v Carines*, 460 Mich 750, 771; 597 NW2d 130 (1999). Moreover, given the scant evidence of the remaining elements of duress, we find that any instructional error did not result in a miscarriage of justice. *Dupree*, 486 Mich at 702.

## C. CONSOLIDATED TRIAL

### 1. STANDARD OF REVIEW

Cope also challenges the joinder of the trials. "Generally, a trial court's ultimate ruling on a motion to sever is reviewed for an abuse of discretion." *People v Williams*, 483 Mich 226, 234 n 6; 769 NW2d 605 (2009) (quotation marks and citation omitted). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *Unger*, 278 Mich App at 217. We review an unpreserved claim of ineffective assistance of counsel for mistakes apparent on the record. *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002).

### 2. BACKGROUND LAW

The court rules dictate the joinder of trials in various circumstances. See MCR 6.121. Relatedly, MCL 768.5 provides, "When 2 or more defendants shall be jointly indicted for any criminal offense, they shall be tried separately or jointly, in the discretion of the court." Neither defendant contends that the charged offenses are unrelated.

"Inconsistency of defenses is not enough to mandate severance; rather, the defenses must be mutually exclusive or irreconcilable." *People v Hana*, 447 Mich 325, 349; 524 NW2d 682 (1994) (quotation marks omitted). Incidental spillover prejudice, which is almost inevitable in a joint trial, does not meet this threshold showing. *Id.* Rather, "[t]he tension between defenses

-8-

must be so great that a jury would have to believe one defendant at the expense of the other." *Id.* Defenses are deemed antagonistic when it appears that one defendant might testify to exculpate himself and incriminate his codefendant. *Bosca*, 310 Mich App at 19. "A confession is not antagonistic for the purposes of determining whether to sever a trial where the confession of a codefendant incriminates both the codefendant and the defendant." *People v Harris*, 201 Mich App 147, 153; 505 NW2d 889 (1993). Also, the risk of prejudice can be allayed with proper instructions. *Hana*, 447 Mich at 351.

"Severance is mandated under MCR 6.121(C) only when a defendant provides the court with a supporting affidavit, or makes an offer of proof, that clearly, affirmatively, and fully demonstrates that his substantial rights will be prejudiced and that severance is the necessary means of rectifying the potential prejudice." *Id.* at 346. "The failure to make this showing in the trial court, absent any significant indication on appeal that the requisite prejudice in fact occurred at trial, will preclude reversal of a joinder decision." *Id.* at 346-347. "The burden is on the accused to make an affirmative showing that a substantial right will be prejudiced in a joint trial." *Harris*, 201 Mich App at 153.

Moreover, "[f]inger pointing by the defendants when [an aider and abettor] theory is pursued, does not create mutually exclusive antagonistic defenses." *Bosca*, 310 Mich App at 19 (quotation marks and citation omitted; alteration in original). "Because an aider and abettor can also be held liable as a principal, both defendants can be convicted at a single trial without any prejudice or inconsistency." *Id.* (quotation marks and citation omitted).

### 3. APPLICATION

At the pretrial hearing on the motion to join the trials, Cope did not clearly assert his position on the matter. In fact, Cope made several statements in agreement with the prosecution at the hearing, and ultimately stated that he saw both sides of the argument. We see no clear assertion or request that the trials be separate. As we have repeatedly recognized, "A party may not take a position in the trial court and subsequently seek redress in an appellate court that is based on a position contrary to that taken in the trial court." *Blazer Foods, Inc v Rest Properties, Inc*, 259 Mich App 241, 252; 673 NW2d 805 (2003) (quotation marks and citation omitted). Furthermore, a conclusory statement of antagonistic defenses is insufficient to establish that the defenses are irreconcilable. *Harris*, 201 Mich App at 152-153.

Nor does Cope identify what prejudice resulted *to him* from joining the trials. If the jury were to believe the defense of duress that Cope presented, he would have been exonerated. If the jury were to believe Sadowski's testimony regarding what occurred that night—that the victims were fabricating the torture and unlawful imprisonment—then Cope again would be exonerated alongside Sadowski.[4] In other words, even if the jury believed Sadowski, it was not at the

---

[4] Sadowski testified that it was Angel and Becky who fought, and that when he came down to the basement and saw the two women duct taped, Angel was holding the duct tape, and Angel said that neither her nor Becky were leaving until they had returned Sadowski's money.

expense of Cope. *Bosca*, 310 Mich App at 19. Further, the jury was instructed that it had to consider each defendant separately. *Hana*, 447 Mich at 351.

Nor does Cope fully acknowledge that the prosecution presented an aiding and abetting theory of the crime. As the Court in *Hana* explained, when an aider and abettor theory is presented to the jury, finger pointing does not create mutually exclusive antagonistic defenses. *Hana*, 447 Mich at 360-361. That is especially true in this case, as Cope was merely contending that he should not be held liable because he was acting under duress. As will be discussed *infra*, the joint trial may very well have enhanced Cope's defense strategy. "In the absence of proof that clearly, affirmatively, and fully demonstrated that defendant's substantial rights were prejudiced and that severance was necessary, we will not interfere with the trial court's discretion." *Hana*, 447 Mich at 355.

Nor do we find meritorious Cope's claim that his counsel's failure to object to the joint trial constitutes ineffective assistance of counsel. In order to establish a claim for ineffective assistance of counsel, a defendant must first demonstrate that "counsel's representation fell below an objective standard of reasonableness," which requires a showing "that counsel's performance was deficient." *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984). A defendant must then demonstrate that "the deficient performance prejudiced the defense," which "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial . . . ." *Id.* at 687. The Court has held that this second prong asks whether "there was a reasonable probability that the outcome of the trial would have been different had defense counsel" adequately performed. *People v Grant*, 470 Mich 477, 496; 684 NW2d 686 (2004).

Cope has not demonstrated that his counsel's decision was anything other than trial strategy. Cope's counsel vigorously presented a duress defense at trial. At every opportunity, his counsel elicited testimony that characterized Sadowski as violent and in control of the night and of Cope. For example, it was Cope's counsel who elicited significant testimony regarding the gun found under Sadowski's pillow, even though such evidence had nothing to do with the crime at issue, and Sadowski's background as a MMA fighter. Cope's counsel may very well have concluded that the probability of this evidence being admitted were better at a joint trial, and that the jury would be more likely to believe the duress defense with Sadowski present at trial. His counsel also may have strategized that the duress defense might be received at a joint trial. Cope has not demonstrated that he was denied the effective assistance of counsel. *Strickland*, 466 US at 687.

## D. BECKY'S TESTIMONY

### 1. STANDARD OF REVIEW

Lastly, Cope challenges the exclusion of one part of Becky's testimony. "This Court reviews a trial court's decision to admit or exclude evidence for an abuse of discretion." *People v Dobek*, 274 Mich App 58, 93; 732 NW2d 546 (2007). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *Unger*, 278 Mich App at 217. When the decision involves a preliminary question of law, such as the interpretation of the Michigan Rules of Evidence, our review is *de novo*. *Dobek*, 274 Mich

App at 93. "A trial court necessarily abuses its discretion when the court permits the introduction of evidence that is inadmissible as a matter of law." *Id.* Ultimately, "[a]n error in the admission or exclusion of evidence will not warrant reversal unless refusal to do so appears inconsistent with substantial justice or affects a substantial right of the opposing party." *Id.*

## 2. ANALYSIS

The trial court went through the preliminary examination testimony of Becky Bressette, who had died before trial. The court made certain rulings regarding the admissibility of portions of her testimony. One such ruling was to exclude the following question:

> *Q*: And that if Mr. Cope got caught helping you, then he was fearful that Mr. Sadowski was going to beat him up?
>
> *A*: Yes.

The court struck this answer based on lack of foundation. On appeal, Cope focuses on how important this evidence was to his duress defense. Although Cope would have preferred this evidence admitted, that does not demonstrate the trial court erred in excluding it.

Pursuant to MRE 602, "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness' own testimony." MRE 701 provides that if the witness is not testifying as an expert, then her "testimony in the form of opinions or inferences is limited to those opinions or inferences that are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based in scientific, technical, or other specialized knowledge within the scope of Rule 702."

The disputed question in the instant case called for Becky to speculate that Cope was "fearful" that Sadowski was going to "beat him up" if Cope was caught helping Becky and Angel. Even if the trial court erred in excluding this single question, "[a]n error in the admission or exclusion of evidence will not warrant reversal unless refusal to do so appears inconsistent with substantial justice or affects a substantial right of the opposing party." *Dobek*, 274 Mich App at 93.

Here, reversal is not warranted, and Cope was not denied his due process right to present a defense. *People v King*, 297 Mich App 465, 473; 824 NW2d 258 (2012). Through this same witness, Cope was able to introduce ample evidence to support his duress theory. For example, Becky was permitted to testify that Cope would not untie her because he said that Sadowski would then come after him. Becky also testified that she believed Sadowski was controlling Cope. Becky testified that she informed the police that Cope told her he could not help them because then Sadowski would "kill them all."

Thus, the trial court's ruling was not an exclusion of all evidence supporting defendant's duress defense. Rather, it was simply an exclusion of a single question with a questionable foundational basis. Defendant was not denied his constitutional right to present a defense, nor

was the court's ruling inconsistent with substantial justice or detrimental to a substantial right of defendant. Therefore, reversal is not warranted.

III. DOCKET NO. 322621 (SADOWSKI)

A. CONFRONTATION CLAUSE

1. STANDARD OF REVIEW

Sadowski first challenges that his confrontation rights were violated. Whether the admission of the disputed statements "violated defendant's Sixth Amendment right of confrontation is a question of constitutional law that this Court reviews de novo." *People v Fackelman*, 489 Mich 515, 524; 802 NW2d 552 (2011). "We review preserved issues of constitutional error to determine whether they are harmless beyond a reasonable doubt. A constitutional error is harmless if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *People v Dendel*, 289 Mich App 445, 475; 797 NW2d 645 (2010) (quotation marks and citation omitted).

2. BACKGROUND LAW

Both the United States Constitution and the Michigan Constitution afford a criminal defendant the right to be confronted with witnesses against him. *Fackelman*, 489 Mich at 525. See US Const, Am VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]"). See also Const 1963, art 1, § 20. Further, MCL 763.1 expressly provides that a criminal defendant has the right to "meet the witnesses who are produced against him face to face." The right to confront and cross-examine witnesses is granted in criminal trials because it promotes reliability. *Fackelman*, 489 Mich at 528. Further, "the Confrontation Clause applies only to statements used as substantive evidence." *Id.* "[T]he right of confrontation is concerned with a specific type of out-of-court statement, i.e., the statements of 'witnesses,' those people who bear testimony against a defendant." *Id.*, citing to *Crawford v Washington*, 541 US 36, 51; 124 S Ct 1354; 158 L Ed 2d 177 (2004). Generally, " '[t]he Confrontation Clause of the Sixth Amendment bars the admission of testimonial statements of a witness who did not appear at trial, unless the witness was unavailable to testify and the defendant had a prior opportunity to cross-examine the witness.' " *People v Bennett*, 290 Mich App 465, 481; 802 NW2d 627 (2010), quoting *People v Walker (On Remand)*, 273 Mich App 56, 60-61; 728 NW2d 902 (2006).

In *Bruton v United States*, 391 US 123, 126; 88 S Ct 1620; 20 L Ed 2d 476 (1968), the United States Supreme Court held that a defendant's confrontation rights are violated when a nontestifying codefendant's statement, which implicates defendant, is introduced at their joint trial. See also *Pipes*, 475 Mich at 274-275. The Court in *Bruton*, 391 US at 135, also held that a limiting instruction—cautioning the jury that the statement can only be used against the codefendant—is not sufficient to cure the prejudice because "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." See also *People v Frazier*, 446 Mich 539, 544; 521 NW2d 291 (1994); *People v Akins*, 259 Mich App 545, 560; 675 NW2d 863 (2003) (A defendant is "deprived of his Sixth Amendment right to confrontation

when the facially incriminating unredacted confession of a nontestifying codefendant was admitted at their joint trial, even if the jury was instructed to consider the confession only against the codefendant.").

The *Bruton* Court explained that statements offered from codefendants are inherently suspect because the declarant is motivated by a desire to shift the blame. 391 US at 136. In a joint trial, when the jury hears the codefendant's "powerfully incriminating statement that expressly names the defendant and describes the defendant's role in the crime, the risk is that the jury will consider the codefendant's statement in assessing the guilt of the defendant despite an instruction telling it not to do so." *Frazier*, 446 Mich at 545.

However, if the codefendant testifies, there is no reversible error. *Pipes*, 475 Mich at 275. Also, although "redacted confessions" are still "clothed with a presumption of unreliability[,]" *People v Banks*, 438 Mich 408, 421; 475 NW2d 769 (1991), "there is not a violation of the Confrontation Clause where the name and the role of a defendant has been removed from the codefendant's statement," *Frazier*, 446 Mich at 546. As the United States Supreme Court explained in *Richardson v Marsh*, 481 US 200, 211; 107 S Ct 1702; 95 L Ed 2d 176 (1987), "the calculus changes when confessions that do not name the defendant are at issue." See also *Frazier*, 446 Mich at 545-546. "[T]he Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Richardson*, 481 US at 211. However, "[i]f a 'substantial risk' exists that the jury, despite cautionary instructions, will consider a codefendant's out-of-court statement in deciding the defendant's guilt, the statement—even though redacted to delete the defendant's name—will be rendered inadmissible at a joint trial." *Banks*, 438 Mich at 421.

Nevertheless, the harmless error rule applies to *Bruton* errors. *Frazier*, 446 Mich at 547. Thus, the codefendant's statement is evaluated in the context of the properly admitted evidence against defendant. Relevant factors include whether the codefendant's statements facially implicate defendant, or whether they become damaging only when linked with evidence introduced later at trial. *Id*. See also *Richardson*, 481 US at 208. Also relevant is whether defendant's own confession is admitted, and whether it mirrors the codefendant's statement. *Pipes*, 475 Mich at 276.

### 3. VIOLATION

Of initial significance is that in this case, Sadowski's counsel raised a pretrial motion regarding this issue. The prosecution expressly agreed that the police officers could not testify about what Cope told them during their interview. Consequently, the pretrial order specified that any such statements from Cope must be redacted so that they were only admissions "about [Cope's] own conduct and not testimony regarding Defendant Sadowski's conduct."

Despite this clear directive, the prosecution and Cope's counsel elicited testimony in flagrant disregard of this pretrial ruling. Detective Chris Croley testified that Cope informed him that he did not call 911 during the criminal episode because he did not want to "go against" Sadowski and did not want to "get in trouble" with Sadowski. Detective Croley also testified that Cope confessed that he was sleeping in the basement when Sadowski and the two victims

came down in the basement. Detective Croley testified that Cope admitted to giving the victims Xanax but did not specify whether he did so to help Sadowski sedate them "so he could beat them easier." When asked if Cope indicated that he was acting out of fear or retaliation, Detective Croley testified that Cope simply said that he was aware that Sadowski knew martial arts. Detective Croley also testified that Cope informed him that he was very familiar with Sadowski's background as a fighter.[5]

These statements were in no way redacted, and explicitly implicated Sadowski in the crimes. *Richardson*, 481 US at 208. In particular, the testimony that Cope did not call 911 because he did not want to "go against" Sadowski and did not want to "get in trouble" with Sadowski clearly cast Sadowski as the ringleader of the criminal episode. Sadowski was named in the confession, and his role was divulged. The unredacted confession also placed Sadowski at the scene of the crime, entering the basement with the two victims, as well as characterized Sadowski as acting in a manner consistent with his MMA fighting history. All of this testimony culminated in an implication that Sadowski committed the crimes. But Sadowski was unable to cross-examine Cope on any of these statements because Cope did not testify.

Because these unredacted statements "expressly implicated the defendant," they violated his confrontation rights. *Frazier*, 446 Mich at 547.

## 4. HARMLESS ERROR

However, as discussed *supra*, that does not end our inquiry. We must examine whether this violation amounted to harmless error. "A constitutional error is harmless if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Dendel*, 289 Mich App at 475 (quotation marks and citation omitted).

The evidence in this case essentially came down to believing the victims' account of the night or defendant Sadowski's account. All parties agreed that the night began when Angel and Becky approached Sadowski behind the bar, although the victims did not provide a consistent timeline for when this occurred. All parties voluntarily went back to Sadowski's gym.

Although both victims admitted to stealing money from Sadowski, they did not provide a consistent story regarding the amount taken. At trial, Angel testified that she took four dollars, giving two to Becky. However, the first responding police officer testified that Angel informed him that she had stolen three dollars and Becky had taken ten dollars. Becky, on the other hand, testified that Angel took a couple of dollars while Becky grabbed a handful of change.

Angel testified that after the theft, she asked to use the bathroom, which is when she confessed to Sadowski about the theft. Becky, however, testified that only Sadowski went to the bathroom, and that when he returned he accused them of taking money. While Angel eventually

---

[5] Objections were sustained to several questions, such as whether Cope confessed that he was trying to help the victims through the "ordeal that Mr. Sadowski was putting them through" and whether Cope said that the event was his idea.

admitted that she may have argued with Becky about the money, Becky testified that such an argument did not occur until they reached the basement.

Both victims testified that as soon as Becky handed Sadowski the money, he hit her. Becky testified that after being hit, she grabbed onto the curtains and pulled them off, but police pictures purported to show those curtains still intact and installed on the window. Becky also testified that Sadowski made her lie on the bed and forced Angel to insert her hand inside of Becky's vagina at least twice to check if money was hidden there. Angel vehemently denied inserting her fingers inside of Becky's vagina.

Both women testified that Sadowski was holding a sword and forced them to go downstairs to the basement, where Cope was sleeping. Becky did not recall precisely who duct taped them to the pole, although she testified that Cope either taped them or helped Sadowski tape them. At trial, Angel first testified that Cope duct taped her to the pole. However, she admitted that she told the police that Sadowski duct taped her and Becky to the poles. She later testified that she was not sure who taped whom, but that it was a joint effort.

Both victims testified that Sadowski smashed their heads into the poles, threatened to kill them, choked them multiple times until they both lost consciousness, and repeatedly beat them. Angel testified that she vomited on herself and Becky testified that she was burned with a cigarette. Despite the torture, Angel claimed that she somehow befriended Sadowski and convinced him to cut her loose, which is when she located a cellular phone and called 911.

Sadowski, on the other hand, testified to a much different chain of events. He claimed that after the theft was revealed, the night devolved into a fight between Becky and Angel, with each woman alternating between denials and shifting the blame. The two women continued to argue until it escalated into a physical altercation, wherein they were punching each other and careening into furniture. Sadowski testified that his role in the ensuing evening was an attempt to deescalate the mounting tension between the two women, and to recover the remainder of his money and missing marijuana.

Sadowski claimed that when returning to the basement after searching for his missing possessions, he encountered the shocking sight of Becky and Angel duct taped to the poles. Sadowski testified that Angel was in the midst of winding tape, and Cope was standing next to her. When he asked what was going on, Angel replied that no one was leaving until he recovered the remainder of his money. Sadowski cut Angel loose and cut off the tape around Becky's head. He was leaving the gym to get them coffee when he encountered the police.

As for other witnesses or evidence supporting either version of events, the two police officers responding to the 911 call testified that they encountered Sadowski leaving the building. Sadowski first refused them access without a warrant, but eventually let them enter. Both officers testified that Sadowski said there was no basement to the building. One officer testified that he heard music emanating from the basement and that upon entering, Angel rushed him and that both women were hysterical. The officers testified that Cope was standing between Becky and Angel, and that Becky was sitting on the ground with her arms around a pole and duct tape around her arms. While Becky had duct tape on her wrists, she was able to undo it herself.

Several police officers testified about the obvious injuries Becky and Angel had on their bodies, which primarily consisted of significant bruising and duct tape residue. One officer testified that no cuts or bruises were found on Sadowski's hands. An officer testified that he did not recall Angel mentioning a sword. While swords were located in the building, none were taken into evidence. No DNA analysis was performed on the duct tape, and several empty vodka bottles were found in the basement.

Pietro, Sadowski's ex-wife, testified that she was at the gym on the morning in question, the two victims were fine, there was no yelling or screaming, and they did not seem agitated. Nevertheless, she also admitted that she was in love with Sadowski and that they had talked about the case extensively. The police officers at the scene who encountered Pietro testified that she did not tell them that she had been in the residence during the alleged incident.[6]

Dr. Vanderschaaf examined both Angel and Becky. He noted several bruises and abrasions on both women, as well as tape residue. An x-ray of Becky's shoulder and CT scan of her head revealed no significant injuries. His medical conclusion was that she had a concussion and contusions on her shoulder, neck, and head. He testified that Becky did not report cigarette burns. He examined trial photographs and concluded that while she could have been burned, the markings also were consistent with some other type of lesion or sore.[7] Becky denied any sexual assault. Angel also denied that she was sexual assaulted. Dr. Vanderschaaf testified that Angel's CT scan of the head revealed nothing remarkable, and his medical diagnosis was a concussion with multiple contusions.

Dr. Vanderschaaf testified that he did not observe any physical signs of strangulation on Becky or Angel during his examination.[8] He also testified that Angel's and Becky's injuries were consistent with the story they provided, but also could have occurred in a different way, namely, a fist fight with another person. He testified that the injuries could be consistent with the victims punching or hitting each other, bumping into furniture, or falling.

Thus, despite the prosecution's arguments on appeal, this was not a case with overwhelming evidence of guilt. It comes down to being a case of "he said, she said." There was significant exculpatory evidence. Dr. Vanderschaaf specifically testified that the victims' injuries were consistent with either version of events. Although the police officers gave testimony regarding their observations, the prosecution highlights nothing from their testimony that disproves Sadowski's rendition beyond a reasonable doubt. The victims also had many discrepancies in their account of the night and crimes.

---

[6] Angel's fiancé also testified that he repeatedly called throughout the night and that eventually a man answered and said that Angel and Becky had left hours ago. Although Sadowski admitted to receiving several messages from the fiancé, he testified that Angel told him to ignore them.

[7] A police officer testified that he saw evidence of a cigarette burn and that Becky showed evidence of being strangled.

[8] He did acknowledge that a nurse observed some small bruising and a little redness on the front part of Angel's neck, and trial photographs could show signs of strangulation on Becky.

Further, it should be noted that the magnitude of the error at issue is great, as defendant's confrontation rights were violated through the admission of Cope's unredacted statements incriminating Sadowski. A constitutional error is harmless only if it is clear *beyond a reasonable doubt* that a rational jury would have found the defendant guilty absent the error. *Dendel*, 289 Mich App at 475. With two very different accounts of the night, what codefendant Cope said to the police about the night in question was critical. Cope incriminated defendant Sadowski in a manner that violated Sadowski's confrontation right because he had no opportunity to cross-examine Cope. In light of the circumstantial nature of this case, which largely depended on significant credibility determinations, it cannot be said that the violation of Sadowski's confrontation rights was harmless beyond a reasonable doubt. Compounding this fundamental violation of Sadowski's confrontation rights is the fact that the prosecution presented this evidence after having stipulated that it would not do so.

Lastly, while the trial court gave a limiting instruction, the instruction did not cure the prejudice because "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Bruton*, 391 US at 135. Thus, we agree with defendant Sadowski that he is entitled to a new trial based on the violations of his Sixth Amendment right to confront witnesses presented against him.[9]

## B. HANDGUN EVIDENCE

## 1. STANDARD OF REVIEW

Sadowski also challenges the admission of the handgun evidence, which was not used in the alleged criminal activity and admitted over defense objection. An issue is preserved for appellate review if it is raised before, addressed by, and decided by the lower court. *People v Metamora Water Service, Inc*, 276 Mich App 376, 382; 741 NW2d 61 (2007). Although Sadowski objected based on relevance and prejudice grounds, he did not raise a character evidence challenge. A defendant must timely and specifically object. *People v Moorer*, 262 Mich App 64, 78; 683 NW2d 736 (2004). Thus, only the first two grounds are preserved for appellate review.

"This Court reviews a trial court's decision to admit or exclude evidence for an abuse of discretion." *Dobek*, 274 Mich App at 93. "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *Unger*, 278 Mich App at 217. When the decision involves a preliminary question of law, such as the interpretation of the Michigan Rules of Evidence, our review is *de novo*. *Dobek*, 274 Mich App at 93. "A trial court necessarily abuses its discretion when the court permits the introduction of evidence that is inadmissible as a matter of law." *Id.* Ultimately, "[a]n error in the admission or exclusion of evidence will not warrant reversal unless refusal to do so appears inconsistent with

---

[9] Sadowski also raises the issue of the consolidated trial with Cope. However, because Sadowski is entitled to a new trial and Cope is not, this issue is now moot because only Sadowski will be retried. We therefore decline to address it.

substantial justice or affects a substantial right of the opposing party." *Id.* An unpreserved claim is reviewed only for plain error. *Carines*, 460 Mich at 764-765.

## 2. DISPUTED TESTIMONY

Despite being unrelated to the charged crimes, extensive testimony was admitted regarding the gun found under Sadowski's pillow. Chief Daniel Willey testified that a gun was located underneath Sadowski's pillow. Various photographs of the gun were admitted into evidence, and Chief Willey testified that it is a Smith & Wesson, "nine millimeter semi-automatic handgun." He testified that the handgun was loaded and had an extra magazine next to it. Cope's counsel asked, "So this gun is ready to shoot. All you need to do is pull back the trigger; is that correct?" Chief Willey replied in the affirmative. Cope's counsel then had Chief Willey detail the precautions police officers took when encountering a loaded weapon, which further underscored the danger. Chief Willey testified that he considered it a dangerous weapon. Chief Willey also testified that the gun was within arm's reach of anyone who was on Sadowski's bed. Chief Willey testified that neither victim mentioned a firearm being used during the crime.

As this evidence came out during the prosecution's case-in-chief, defendant responded by having Pietro testify that it was her gun, and that it was not registered. She also testified that Sadowski instructed her to retrieve the gun, although he had probably touched it.

Then, when Sadowski testified, Cope's counsel again raised the issue of the gun. He asked if Sadowski knew it was there, if he knew it was a Smith & Wesson nine-millimeter handgun, if he knew that it had a full magazine, and whether it was cocked and ready to fire. Counsel asked if Sadowski was bothered by the fact that the two victims allegedly were fighting in this small room in close proximity to the gun. Counsel asked Sadowski if he carried a gun in his waist pocket, to which he replied in the negative. Cope's counsel also asked, "You know it's illegal for you to have possession of a handgun; right?" Sadowski replied, "That is correct." Although Sadowski quibbled about whether he actually possessed the handgun, he eventually admitted that his fingerprints were probably on the gun.

Then, the prosecution, in cross-examination, again raised the issue of the gun. It asked Sadowski if the gun was found under his pillow and whether it belonged to him. Sadowski admitted that the gun was found under his pillow, but denied that it belonged to him. He testified that it belonged to his ex-wife. The prosecution asked, "And because you can't lawfully possess that gun, you would under oath swear that your fingerprints would no – any way, shape or form appear on that gun; correct?" Sadowski testified that he probably touched the gun, but that it did not belong to him. The prosecution asked if the gun was under his control, and Sadowski testified that because Pietro left it there, he guessed it was under his control. The prosecution continued to question Sadowski about why Pietro would leave the gun there and how Sadowski had touched the gun.

In closing argument, Cope's attorney argued, "Not only does [Sadowski] have martial arts skills, he's got a sword and a loaded gun under his pillow, with a bullet in the chamber, ready to go." In Sadowski's closing argument, he argued that the gun was irrelevant and

inflammatory. The prosecution referenced Cope's argument that he knew Sadowski had a gun and a sword, and warned the jury only to consider the evidence.

## 3. BACKGROUND LAW

Generally, all relevant evidence is admissible. MRE 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. MRE 403 states, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Nevertheless, "[a]ll relevant evidence is prejudicial; it is only unfairly prejudicial evidence that should be excluded. Unfair prejudice exists when there is a tendency that evidence with little probative value will be given too much weight by the jury." *People v McGhee,* 268 Mich App 600, 613-614; 709 NW2d 595 (2005). In other words, unfair prejudice occurs when the disputed evidence injects considerations extraneous to the merits of the case, such as the jury's bias, sympathy, anger, or shock. *Id.* at 614.

Pursuant to MRE 404(b), evidence of other crimes, wrongs, or acts may be admissible "as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case." As the Michigan Supreme Court has elucidated, "[e]vidence relevant to a noncharacter purpose is *admissible* under MRE 404(b) *even if* it also reflects on a defendant's character. Evidence is *inadmissible* under this rule *only* if it is relevant *solely* to the defendant's character or criminal propensity." *People v Mardlin*, 487 Mich 609, 615-616; 790 NW2d 607 (2010) (emphasis in original). In order for other acts evidence to be admissible under MRE 404(b), the following four-part test must be met: (1) the evidence must be offered for a proper purpose; (2) it must be relevant; (3) the probative value of the evidence may not be substantially outweighed by the danger of unfair prejudice; and (4) the trial court may, upon request, provide a limiting instruction to the jury. *People v VanderVliet,* 444 Mich 52, 55; 508 NW2d 114 (1993) amended 445 Mich 1205 (1994).

## 4. APPLICATION

In this case, there was no evidence that a gun was used during the criminal activities. Nor was defendant charged with or convicted of any gun-related crimes. While the gun was found hidden beneath defendant's pillow in a police search after the crime, it was not pertinent to the criminal activity at issue. Although the prosecution contends that it was Cope's counsel who initially introduced this topic because it was relevant for the duress defense, there is no evidence that Cope knew of the existence of the gun or that it in any way influenced Cope's actions on the

night in question.[10] Further, contrary to the parties' arguments on appeal, the prosecution did not remain above the fray. It too elicited testimony regarding the gun.

The extended testimony regarding the gun was not relevant to the crimes charged against Sadowski. The gun did not have any tendency to make the existence of any fact that is of consequence to the determination of the action at issue more or less probable than without the evidence. MRE 401. Further, in light of the complete absence of relevancy, it appears that the gun evidence was deliberately injected into the proceedings to either confuse the issues, mislead the jury, or create unfair prejudice. MRE 403. In fact, this evidence is precisely the type that should be excluded under MRE 403: evidence with little probative value that the jury has the tendency to give too much weight to, given its inflammatory nature. *McGhee*, 268 Mich App at 613-614.

This case involved significant credibility determinations between the victims' account of the night and defendant Sadowski. According to the victims, Sadowski essentially turned into a violent, abusive, sword-wielding captor the moment they confessed to taking a relatively minimal amount of money. In assessing the credibility of this story, the jury could not help but consider the fact that defendant had a gun hidden beneath his pillow, which certainly would make it more plausible that, indeed, he was a violent individual.

Further, the testimony did not simply extend to the presence of the gun beneath Sadowski's pillow. Instead, both the prosecution and Cope's counsel elicited testimony that it was "illegal" for Sadowski to possess this gun. As noted *supra*, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. MRE 404(b). The testimony directly referenced the illegality of Sadowski possessing this weapon. The conclusion the jury could draw was that Sadowski possessed this gun in some illegal manner, or that he could not possess this gun because he was prohibited based on his past crimes. In either instance, this was a direct reference to uncharged bad acts or crimes that Sadowski committed.

The prosecution does not even attempt to argue that such questions or evidence were offered for a proper purpose under MRE 404(b). Further, while we review this for plain error, we conclude that the prejudicial nature of this error affected Sadowski's substantial rights. Not only was the jury repeatedly apprised of the fact that Sadowski possessed a gun, but that prejudice was compounded with the knowledge that he was possessing the firearm illegally. This cast him under a cloud of criminal suspicion. It is for this reason that such evidence must be excluded. We also note that Cope's counsel repeatedly emphasized the presence of the gun during closing argument, and no limiting instruction was given.

---

[10] Thus, the exclusion of this irrelevant and highly prejudicial evidence would not infringe on Cope's right to present a defense, as that right must give way to the rules of evidence. *People v King*, 297 Mich App 465, 474; 824 NW2d 258 (2012).

The erroneous and deliberate introduction of this highly prejudicial testimony would merit reversal and retrial. However, because retrial is already warranted, it is sufficient to direct the court on retrial to exclude this evidence.

## IV. CONCLUSION

In Docket No. 321697, we conclude that there was sufficient evidence supporting Cope's convictions and reversal is not warranted based on the jury instructions, the joinder of the two trials, or the exclusion of evidence. Nor was Cope denied the effective assistance of counsel or entitled to a remand. We have reviewed all remaining claims and find them to be without merit. Cope is not entitled to reversal or a new trial.

However, in Docket No. 322621, we find that defendant Sadowski's confrontation rights were violated, and the violation was not harmless. Thus, he is entitled to a new trial. Upon retrial, evidence regarding the handgun should not be admitted.

We affirm in Docket No. 321697 and vacate defendant's convictions in Docket No 322621. We do not retain jurisdiction.

/s/ Jane E. Markey
/s/ Cynthia Diane Stephens
/s/ Michael J. Riordan

-21-